**********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 *********** RULINGS ON DEFENDANTS' MOTIONS TO DISMISS
On April 20, 2007, Deputy Commissioner Glenn filed an Opinion and Award and the parties received the Opinion and Award on the same date, via facsimile. Plaintiff filed a Motion for Reconsideration, which was received by the Commission via facsimile at 5:33 p.m. on May 7, 2007. Defendants filed a response and, on May 11, 2007, Deputy Commissioner Glenn entered an Order denying plaintiff's Motion for Reconsideration. On May 29, 2007, plaintiff appealed to the Full Commission from Deputy Commissioner Glenn's May 11, 2007 Order. *Page 3 
Defendants filed Motions to Dismiss, alleging plaintiff's Motion for Reconsideration and appeal were not timely filed.
In this case, the period for filing plaintiff's Motion for Reconsideration expired on Friday, May 4, 2007. Plaintiff's appeal was received by the Commission on Monday, May 7, 2007, and was therefore not timely filed. It appears that plaintiff's counsel is arguing excusable neglect, pursuant to N.C. Gen. Stat. § 1A-1, Rule 60(b), even though such an argument is not delineated in plaintiff's brief. Pursuant to Rule 60(b), the Commission has the authority to grant the relief sought by plaintiff. See, Egan v. Excaliber Resort Professional, ___ N.C .App. ___,663 S.E.2d 914 (2008); Murray v. Ahlstrom Indus. Holdings, Inc.,131 N.C. App. 294, 506 S.E.2d 724 (1998); Allen v. Food Lion, Inc.,117 N.C. App. 289, 450 S.E.2d 571 (1994). In the Allen case, the facts were similar to the case at bar, in that the notice of appeal was filed 16 days after receipt of the Opinion and Award. Accordingly, defendants' Motion to Dismiss for plaintiff's failure to timely file the Motion for Reconsideration is DENIED.
Regarding plaintiff's appeal to the Commission from Deputy Commissioner Glenn's May 11, 2007 Order, the time for filing plaintiff's appeal expired on May 28, 2007; however, it was not filed until the next day, on May 29, 2007. It is the normal business practice of the Commission to maintain a transmission acknowledgment for the filing of an Order via facsimile. However, in this case, the Commission has no acknowledgement on file indicating when the Commission faxed plaintiff or when plaintiff received Deputy Commissioner Glenn's May 11, 2007 Order. Thus, the Commission cannot independently confirm the date plaintiff received the Order and from which to calculate the 15-day appeal period. For this reason, defendants' Motion to Dismiss plaintiff's appeal is DENIED.
 *********** *Page 4 
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. An employee-employer relationship existed between defendant-employer and plaintiff at all relevant times.
3. Key Risk Management Services, Inc. was the carrier on the risk for defendant-employer at all relevant times herein.
4. Plaintiff's average weekly wage was $634.39 per week, yielding a compensation rate of $422.95 per week.
5. Plaintiff sustained an injury by accident while in the course of his employment with defendant-employer on or about August 23, 1998.
6. Defendants paid all disability benefits plaintiff was entitled to receive under the North Carolina Workers' Compensation Act through the date of the Deputy Commissioner's hearing.
7. The issues before the Full Commission are whether plaintiff is entitled to any additional benefits under the North Carolina Workers' Compensation Act for past or future attendant care; and, if so, who is entitled to be reimbursed for the care provided to plaintiff. *Page 5 
8. After the hearing before the Full Commission, the parties stipulated to the introduction of medical records, which were submitted to the Commission on February 28, 2008, and supplemented via e-mail to the Commission on March 6, 2008. The deposition of Dr. David R. Wiercisiewski, taken on January 23, 2008, is also hereby admitted into the evidence of record.
9. On September 13, 2005, the parties agreed that Barbara Armstrong would prepare a life care plan for plaintiff and that defendants would pay for the plan. However, at the time of the Deputy Commissioner's hearing, the life care plan had not been received into evidence. Following Ms. Armstrong's deposition on January 18, 2008, the life care plan was introduced into evidence and is hereby admitted into evidence before the Full Commission, along with Ms. Armstrong's deposition testimony.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. On August 23, 1998, plaintiff suffered a compensable brain injury as a result of a motor vehicle accident while he was employed with defendant-employer. At the time of the injury by accident, plaintiff was 35 years old. Defendants admitted plaintiff's right to compensation on a Form 60 and have paid various periods of temporary partial disability and temporary total disability compensation to plaintiff. Defendants' payment of compensation to plaintiff is ongoing.
2. After his injury by accident, plaintiff lived at home with his wife until January 2000, when plaintiff and his wife separated. Thereafter, plaintiff moved into the home of his sister, Robin Miller Chester, and her husband, Stuart Chester. Since approximately June 2000, *Page 6 
plaintiff has paid the Chesters room and board at the rate of $75.00 per week. When plaintiff moved in, the Chesters installed hand railings in the bathroom and a ramp on the front of the house to assist plaintiff.
3. At the Chesters' home, plaintiff organizes his own clothing and personal items in his room. If asked, he is able to put away his clothes after they are washed, unload the dishwasher, vacuum, and take out the garbage, but plaintiff has a very short attention span and often forgets to complete a task as soon as he is asked to perform it. Mr. and Ms. Chester assist plaintiff with his personal grooming. Plaintiff makes tea for the family, but sometimes leaves the stove on. Plaintiff does not cook, but can make himself cereal, sandwiches, and heat up soup in the microwave. He is able to go to the grocery store, but must call home once he is at the store to see what items he should get. Plaintiff can mow the lawn on a riding lawn mower, but Mr. Chester is always outside to supervise plaintiff.
4. Plaintiff smokes a half of a pack of cigarettes per day and the Chesters permit him to smoke in his bedroom and elsewhere in the house. Ms. Chester was not concerned about leaving plaintiff alone in the home, knowing that he was smoking.
5. Plaintiff makes his own doctors' appointments and schedules refills of his medications, but the doctors' offices call Ms. Chester to remind her of the appointments.
6. Plaintiff has had a girlfriend and has spent nights away from home, coming home during the day to get a change of clothes or take a shower. As of the time of the Deputy Commissioner's hearing, plaintiff spent no more than one or two nights per week away from home with friends or a girlfriend, on a sporadic basis. On one occasion, the Chesters left plaintiff at home by himself while they went on a five day vacation, although someone did come in to check on plaintiff. *Page 7 
7. Ms. Chester testified that plaintiff's memory is deteriorating and that his balance and speech have changed. She stated that plaintiff has a flat affect and has lost the ability to show any emotion except anger. According to Ms. Chester, in the months prior to the Deputy Commissioner's hearing, plaintiff was more easily upset and quick tempered, becoming angry at small children and pets.
8. Ms. Chester stated that in the past year, plaintiff has fallen down and lost his balance more frequently, and has difficulty recovering after losing his balance. She also felt that she has to parent plaintiff as she does her daughter, telling him what to do, when to do it and keeping track of him at all times.
9. In July 2000, plaintiff obtained a valid North Carolina driver's license and he owns a motor vehicle. Plaintiff purchases his own insurance and gasoline for his vehicle and comes and goes as he pleases. Mr. Chester helps plaintiff remember to perform routine maintenance on his vehicle. Plaintiff had one motor vehicle accident in 2004 when he ran into a bank of rocks, but Ms. Chester was not aware of any other vehicle incidents. Plaintiff received a ticket for the accident, which was dismissed. He has not received any other speeding citations or traffic violations since living with the Chesters. Mr. Chester did state that he feels that plaintiff often turns too fast, does not slow down enough when making a turn, fails to check his mirrors before changing lanes, waits too long to slow down, cuts off other drivers and exhibits some road rage. Despite these problems, Mr. Chester has no reservations about riding with plaintiff, although Ms. Chester prefers not to ride in the car with plaintiff.
10. Since 2000, plaintiff has maintained his own personal bank account and has the authority to write checks on that account. Mr. Chester keeps the checkbook locked in his safe *Page 8 
because plaintiff tends to spend more money than he has. Mr. Chester also helps plaintiff balance his checkbook.
11. In August 2001, Mr. Chester opened Speedy's Pizza with his brother. Plaintiff began working at the restaurant almost immediately and worked until November 30, 2004. The restaurant opened at 3:00 p.m. and was open until 9:00 p.m. or 11:00 p.m. Plaintiff left for work around 2:30 p.m. to get to work by 3:00 p.m., usually going with Mr. Chester. Plaintiff folded pizza boxes and delivered pizzas, but could only deliver one pizza at a time because he mixed up orders and could not plan his route. Plaintiff wore a uniform and used his own vehicle for deliveries. He was responsible for making change for customers and returning the change to the restaurant. While other delivery drivers were paid minimum wage and tips, plaintiff was not paid for his employment, other than receiving free food. Plaintiff had some difficulty interacting with the public and his co-workers and was unable to maintain appropriate social distance from his female co-workers.
12. Since January 14, 2000, Ms. Chester has worked first shift at Huffman and Mr. Chester worked first shift at Timber Ridge Lumber, both from 7:00 a.m. to 3:30 p.m., leaving plaintiff home alone to plan his daily activities. Two months after starting the pizza business, Mr. Chester left Timber Ridge Lumber and began working first shift in a tire store, in addition to working at the pizza business at night. In February 2003, Speedy's Pizza became Mr. Chester's only employment. The pizza business closed November 30, 2004.
13. Mr. Chester went with plaintiff to the doctor in Charlotte almost every time. He did not want plaintiff driving that far, and plaintiff did not like riding in a cab, so he often took plaintiff. *Page 9 
14. From November 5, 1999 through September 2003, plaintiff underwent rehabilitation efforts, including occupational therapy by Benfield 
Podger. From January 29, 2002 through March 31, 2004, he received vocational rehabilitation assistance from Jim Horn Rehab.
15. Plaintiff pursued an unsuccessful trial return to work at Pizza Hut from April 26, 2003 through June 17, 2003, at which time he was terminated.
16. On August 5, 2003, defendants filed a Form 24 application to terminate compensation, which was denied by the Executive Secretary on December 4, 2003.
17. On April 1, 2004, plaintiff saw Dr. Manish Fodzar. Dr. Fodzar's medical opinion was that plaintiff cannot be functionally and competitively employed, that he is unable to live independently, and that he requires significant assistance with several areas of daily functioning. He felt plaintiff requires assistance preparing meals, remembering to take his medication, refilling prescriptions, attending doctor's appointments, keeping up his personal hygiene, maintaining a household, managing his finances, and decision-making.
18. On January 18, 2005, plaintiff saw Dr. C. Thomas Gualtieri for an independent medical examination. Dr. Gualtieri agreed with Dr. Fodzar and Dr. Wiercisiewski that plaintiff is severely disabled, needs help managing his affairs, and is not likely to be successful in competitive employment. Dr. Gualtieri felt that plaintiff's emotional instability and behavioral inhibition would greatly improve if he was involved in regular community-based programming, such as a sheltered workshop or supervised employment. However, Dr. Gualtieri felt that plaintiff did not require any attendant care, partly relying on the fact that plaintiff is able to drive.
19. The parties deposed Dr. David R. Wiercisiewski, a board certified physiatrist, on January 23, 2008. Dr. Wiercisiewski testified that as of April 18, 2000, plaintiff may be able to *Page 10 
be left alone for four hours at a time with intermittent supervision. He explained that although plaintiff does not require 24-hour monitoring, he cannot live independently. Dr. Wiercisiewski testified that plaintiff needs four different types of assistance: domestic or household assistance; the assistance of a designated payee or trustee for money; administrative, financial, social, and emotional assistance from professionals in those areas; and case management assistance. Dr. Wiercisiewski stated that plaintiff cannot maintain competitive employment, but that he can perform supportive employment. He felt plaintiff would benefit from some sort of supervision and oversight regarding his day-to-day responsibilities, but that plaintiff does not need a skilled nursing aide or certified nursing assistant. Sometime between June and October 2000, Dr. Wiercisiewski gave plaintiff permission to drive a car; however, Dr. Wiercisiewski explained that just because plaintiff maintains a driver's license, it does not mean he can live independently. Dr. Wiercisiewski felt that the ideal living arrangement for plaintiff would be a type of assisted living arrangement where he could live independently, but still have access to a healthcare provider, such as a nurse or CNA, who could provide oversight.
20. On January 18, 2008, the parties deposed Barbara Armstrong, R.N., who is also a certified disability management specialist, a certified case manager, and a certified life care planner. Ms. Armstrong discussed the life care plan she prepared for plaintiff on December 12, 2005. Ms. Armstrong testified that plaintiff does not need skilled nursing care because he is independent in his ability to dress, groom, bathe, and feed himself. However, plaintiff does qualify for a supervised living environment with an in-home aide, supervision support and other services to maximize and/or maintain function and self-direction. Ms. Armstrong agreed with Dr. Wiercisiewski that plaintiff is not able to return to competitive employment or engage in volunteer work independently. Her report further states that plaintiff will need lifelong medical *Page 11 
care, an in-home aide, medications, possible facility placement and other services to help him maintain a good quality of life and to prevent complications. The life care plan states that the cost of a support person would begin at $14.40 per hour and, if plaintiff stayed at a residential facility, the cost would be $300.00 per day.
21. Dr. Wiercisiewski testified and the Commission finds that plaintiff requires four hours of non-continuous, non-skilled attendant care per day, seven days per week and that he can be left alone for up to four hours per day. If plaintiff's family provides him this care, a reasonable rate of pay is the minimum wage. If an outside agency or individual provides plaintiff this care, payment shall be made at a rate contracted to by the parties.
22. The record contains no evidence provided by plaintiff's family regarding any past attendant care they provided to plaintiff. Therefore, plaintiff is not entitled to reimbursement for any past attendant care.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 23, 1998, plaintiff sustained a compensable brain injury as a result of a motor vehicle accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As the result of the admittedly compensable injury by accident, plaintiff is entitled to receive and has been receiving from defendants ongoing total disability compensation. N.C. Gen. Stat. § 97-29. *Page 12 
3. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief, or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
4. Plaintiff is entitled to payment by defendants for four hours of non-continuous, non-skilled attendant care per day, seven days per week. Plaintiff can be left alone for up to four hours per day. If plaintiff's family provides him this care, they shall be paid at the minimum hourly wage. If an outside agency or individual provides plaintiff this care, the caregiver shall be paid at a rate contracted to by the parties.
5. As no evidence was provided regarding any past attendant care plaintiff received, plaintiff is not entitled to reimbursement for any past attendant care. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall continue payment of total disability compensation to plaintiff until further Order of the Commission.
2. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of his injury by accident, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. This includes four hours of non-continuous, non-skilled attendant care for plaintiff, per day, seven days per week, beginning from the date of the filing of this Opinion and *Page 13 
Award. If plaintiff's family provides this care, defendants shall pay the family member at the minimum hourly wage. If an outside agency or individual provides plaintiff this care, defendants shall pay whatever rate is contracted to by the parties.
3. Defendants shall pay the costs.
This 18th day of February 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
NOT AVAILABLE FOR SIGNATURE:
 __________________________________ BUCK LATTIMORE COMMISSIONER *Page 1